UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────

CLAIRE RICHARDSON,

                      **Plaintiff,**           11 Civ. 5142 (JGK)

          **- against -**           MEMORANDUM OPINION
                                             AND ORDER

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                      **Defendant.**
─────────────────────────────────

**JOHN G. KOELTL, District Judge:**

    The plaintiff, Claire Richardson, brought this action to reverse a final decision of the defendant, the Commissioner of Social Security (the "Commissioner"), that the plaintiff was not entitled to Disability Insurance Benefits ("DIB").  The plaintiff filed an application for DIB on September 2, 2008, alleging that she was disabled beginning February 25, 1995.  Her insured status had expired on December 31, 2000.  The plaintiff's application was denied initially on December 26, 2008.  After a hearing on March 2, 2010, an Administrative Law Judge ("ALJ") denied the plaintiff's application on May 26, 2010, finding that the plaintiff was not disabled during the relevant time period.  The ALJ's decision became the final decision of the Commissioner after the Appeals Council declined to review it on January 27, 2011.  The parties have filed cross-

motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## I.

The administrative record contains the following facts.[1]

The plaintiff was born in 1954. (Tr. 42, 110.) She worked as a registered nurse at a hospital from 1980 to February 1995. (Tr. 42-43, 127.) Her nursing job involved, within an eight-hour day, about seven hours of walking or standing, about three hours of sitting, and lifting objects weighing up to twenty pounds. (Tr. 127.) In 1974, the plaintiff was involved in a car accident, fracturing multiple bones in her right leg-- specifically, her right femur, tibia, and fibula. (Tr. 191.) One year later she was in another car accident, re-fracturing those same bones as well as fracturing her left femur. (Tr. 191.)

On January 10, 1995, a magnetic resonance imaging ("MRI") scan of the plaintiff's right knee revealed "[s]evere degenerative and/or post-traumatic changes . . . associated with a medial meniscus tear and a probable small tear involving the

---

[1] Although much of the medical evidence in the record relates to the period after December 31, 2000, the period at issue only spans from the plaintiff's alleged disability onset date, February 25, 1995 through her date last insured, December 31, 2000.

lateral meniscus." (Tr. 251-52.)  On February 24, 1995, the plaintiff underwent arthroscopic surgery of the right knee at the Hospital for Joint Diseases.  (Tr. 173-82.)

Nine days after her knee surgery, the plaintiff saw a physical therapist for an initial evaluation, which revealed reduced motor strength and range of motion of the plaintiff's right knee and leg.  (Tr. 385.)  She began physical therapy exercise on the day of her evaluation, and she attended frequently over the next few weeks.  (Tr. 375, 386-87.)  On March 24, 1995, the plaintiff was able to walk without crutches. (Tr. 387.)  She was discharged from physical therapy three days later, and was instructed to follow a home exercise program. (Tr. 250, 387.)

On April 24, 1995, Dr. Stuart Springer noted that the plaintiff was making very slow progress with physical therapy but that he might allow her to return to work on May 21, 1995. (Tr. 253.)  On June 19, 1995, Dr. Springer noted that recent Cybex testing revealed that the plaintiff's right leg had a "36% quadriceps [muscle] deficit and a 64% hamstring [muscle] deficit." (Tr. 254.)  Because the plaintiff had not met her physical therapy goals with respect to strengthening her right leg, Dr. Springer recommended that she resume physical therapy. (Tr. 254.)  After additional physical therapy, the plaintiff reported on July 12, 1995 that her knee pain was 3 on a scale of

10, and her walking tolerance had increased to thirty minutes. (Tr. 392.)  On October 18, 1995, Dr. Springer wrote a note stating that although the plaintiff had made some progress with an intensive physical therapy program, she still had a significant deficit with respect to her quadriceps and hamstring strength, and he recommended that she continue her program. (Tr. 393.)

On January 23, 1996, the plaintiff saw orthopedist Dr. Barton Nisonson for her right leg pain.  (Tr. 639-40.)  The plaintiff reported that she had swelling and increasing pain in her right leg, and that she had seen several doctors over the past couple of years.  (Tr. 639.)  Dr. Nisonson noted that the plaintiff's right leg was shorter as a result of her injuries, and that she had "rather severe changes" in one part of her knee after her arthroscopic procedure.  (Tr. 639.)  Dr. Nisonson also mentioned that another doctor had recommended an osteotomy because the plaintiff continued to have serious problems.  (Tr. 639.)  Dr. Nisonson then referred the plaintiff to another doctor, recommending a total knee replacement "due to the severity of her . . . serious and complex problem."  (Tr. 640.) On a prescription pad note dated February 13, 1996, Dr. Frederick Buechel also opined that for the plaintiff "TKR" (total knee replacement) surgery would be preferable to a tibial osteotomy.  (Tr. 394.)

On February 15, 1996, Dr. Chitranjan Ranawat saw the plaintiff. (Tr. 397.) The plaintiff reported severe and disabling right-knee pain. (Tr. 397.) She could walk one to three blocks, had difficulty climbing stairs, and used no external supports. (Tr. 397.) Dr. Ranawat noted: "Pain is severe and disabling to her, more on activities and somewhat less with rest." (Tr. 397.) Dr. Ranawat's examination of the plaintiff revealed varus alignment of both lower extremities. (Tr. 397.)

On April 17, 1996, a physical therapist reported that the plaintiff had improved walking endurance and minimal to no instances of ankle locking or knee buckling. (Tr. 406.) The plaintiff was also able to shift comfortably onto her right leg. (Tr. 406.)

On May 29, 1996, the plaintiff saw Dr. Jose Rodriguez for left leg pain after an accident she had while running after her toddler five days earlier. (Tr. 400-01.) Dr. Rodriguez's impression of the plaintiff's left leg injury upon examination was a large hematoma of the left thigh muscle. (Tr. 401.) Although the plaintiff noted that her left leg pain remained quite high, she was able to bear weight on that leg without real difficulty. (Tr. 400.) She was advised to continue assisted walking as the pain and swelling gradually resolved. (Tr. 401.) With respect to her right knee, Dr. Rodriguez advised the

plaintiff about "the complexity of her problem" and informed her that an osteotomy "would not give her enough relief." (Tr. 400.)  Dr. Rodriguez discussed the possibility of a total knee replacement with the plaintiff. (Tr. 400.)

On September 15, 1997, the plaintiff returned to Dr. Springer, who noted her right-knee and gait problems. (Tr. 410.)  In a letter dated February 15, 1998, Dr. Springer explained the plaintiff's past medical history and noted that he did a physical examination of her in April 1995, at which he discussed a new course of physical therapy with her and instructed her to use a cane. (Tr. 426-28.)  Dr. Springer then stated that "[u]nfortunately, since that time she seemed to not significantly improve and began to experience other sensations including a burning like sensation which she described being like a poker was in her knee." (Tr. 427.)  Dr. Springer also noted that the pain and swelling the plaintiff experienced "restricted not only her range of motion, but also her ability to ambulate properly." (Tr. 427.)  Dr. Springer concluded that the plaintiff had "many, many problems with her right knee" and that it was likely that "she will need further, more major, surgery in the future." (Tr. 428.)

On October 13, 1998, the plaintiff saw Dr. Dae-Sik Rho for pain in the legs, ankles, and right knee that was "at times . . . severe" and had become "progressively worse since the

spring." (Tr. 479-80.)  After acupuncture treatment, the plaintiff experienced decreased pain in the left leg but not in the right leg. (Tr. 479.)  Upon physical examination, Dr. Rho observed that the plaintiff walked with a slight limp, and that her right leg was slightly shorter than her left leg. (Tr. 479.)  Dr. Rho also noted that the plaintiff had bone elevation in the right thigh and right tibia, crepitation in the right knee, and tender muscle at the fracture sites. (Tr. 479.)  Dr. Rho's impression was that the plaintiff had "residual (myofascial) pain" from her multiple fractures of the bilaterial extremities, as well as arthritis. (Tr. 480.)  Dr. Rho's recommended treatment for the plaintiff was physical therapy and therapeutic exercises. (Tr. 480.)

On October 26, 1998, Dr. Gerald Smallberg saw the plaintiff for complaints of increasing leg pain. (Tr. 191-92.)  The plaintiff reported that the pain "involves both legs, right more than left, most severe when she gets out of bed in the morning, and it takes her several hours to loosen up.  She also has difficulty walking, and currently cannot walk more than about one to two blocks without having to stop because of severe pain in her legs.  This could go from the hips to the feet, although at times she has some pain into the buttocks." (Tr. 191.)  On examination, Dr. Smallberg observed that the plaintiff was "a healthy-appearing woman complaining of pain." (Tr. 191.)

Straight leg raising was unremarkable and there was no definite muscle pain to palpation, but "[t]here was some pain over her knees and bones in the legs that did not completely reproduce her pain." (Tr. 191.)  The results of the plaintiff's neurological, motor, and sensory examinations were largely normal. (Tr. 192.)  Dr. Smallberg concluded that the plaintiff had "pain in the legs that I cannot fully characterize." (Tr. 192.)  Dr. Smallberg also suspected that there was "some underlying rheumtalogical problem that needs further evaluation." (Tr. 192.)

On November 6, 1998, Dr. Harry Spiera saw the plaintiff, who complained of increased leg pain. (Tr. 498-500.)  The plaintiff reported that she has had "persistent pain in the right knee" ever since her knee surgery. (Tr. 498.)  In the summer of 1998, "she had increased pain in her thighs, which she describes as a squeezing and burning sensation, which comes and goes and occasionally occurs at rest." (Tr. 498.)  At the time she saw Dr. Spiera, the plaintiff believed her ability to walk was "getting worse." (Tr. 498.)  The plaintiff described the pain as "going from the hips down to the ankles but particularly the left foot." (Tr. 498.)  She also stated that "there is a major difference from last year." (Tr. 498.)

Dr. Spiera observed that the plaintiff limped on her right leg and also avoided putting pressure on her left foot. (Tr.

499.)  The plaintiff had no pain on straight-leg raising, but she had decreased sensation in her feet, tenderness in her left foot, and obvious osteoarthritic changes to her right knee. (Tr. 499.)  Lab studies revealed a positive rheumatoid factor. (Tr. 499-500.)  Dr. Spiera ordered a bone scan of the feet because of the plaintiff's severe pain and noted that "there is a major change in both feet."  (Tr. 500.)  Dr. Spiera concluded that "[t]he clinical picture is rather confusing" and found it "difficult to make any specific diagnosis here."  (Tr. 500.)  He ordered an MRI scan of the plaintiff's foot to see "if something else is going on locally such as a possible osteomyelitis." (Tr. 500.)

A bone scan of the plaintiff's lower extremities taken on November 6, 1998 revealed several physiological defects.  (Tr. 489-92.)  A three-phase bone scan of both feet was performed, demonstrating increased perfusion to the left mid-foot as compared to the right.  (Tr. 489.)  Immediate blood pool images demonstrated increased osseous and soft-tissue deposition within the left mid-foot as compared to the right.  (Tr. 489.)  Delayed images of both feet demonstrated intense increased uptake in the left mid-foot.  (Tr. 489.)  Anterior and posterior images of the pelvis and lower extremities demonstrated increased uptake within both knees and ankles "consistent with degenerative change."  (Tr. 489.)  There were also faint sites of increased

uptake in the mid-shafts of both femurs and in the mid-shaft of the right tibia consistent with previous fractures.  (Tr. 489.) In sum, the examination revealed the following: (1) the bone scan of both feet demonstrated increased activity in all three phases of the left mid-foot, which may have been related to osteomyelitis or possibly post-traumatic etiology; (2) there was increased isotopic activity in the mid-shafts of both femurs and in the mid-shaft of the right tibia, consistent with previous fractures; and (3) there was increased isotopic activity in both knees and ankles which was "most likely degenerative in nature." (Tr. 489-90.)

An MRI scan of the plaintiff's left foot taken on or about November 23, 1998 also revealed several physiological defects. (Tr. 412-13.)  There was synovitis of the ankle, as well as fluid about the sheath of the flexor hallucis longus tendon. (Tr. 412.)  There was also soft-tissue fullness in the sinus tarsi "on an inflammatory and/or post-traumatic basis."  (Tr. 412.)  There was signal alteration involving the navicular bone and distal talus centrally and laterally.  (Tr. 412.)  The talonavicular joint was narrowed, and there was a moderately prominent ventromarginal osteophyte.  (Tr. 412.)  There were also moderate degenerative changes of the calcaneocuboid joint with marginal lipping laterally.  (Tr. 412.)  The reviewing physician noted that "[a] major consideration is stress reaction

with underlying arthritic process," but osteomyelitis was thought to be unlikely.  (Tr. 412-13.)

On May 10, 2000, the plaintiff saw Dr. Smallberg for complaints of numbness in the right hand.  (Tr. 528-29.)  The plaintiff mentioned that her leg pains had improved since October 1998, but stated that recently she had been experiencing intermittent numbness in her right foot.  (Tr. 528.)  On examination, Dr. Smallberg noted that the plaintiff was "a healthy-appearing woman in no acute distress."  (Tr. 528.)  The results of the plaintiff's motor examination and sensory examination were normal.  Dr. Smallberg concluded that the plaintiff had "a history of multiple problems that are difficult to tie together with one simple diagnosis," and he referred her for additional testing, including an MRI scan.  (Tr. 529.)  On May 19, 2000, an MRI scan of the plaintiff's cervical spine revealed mild disc bulging and spondylosis at CS-6 greater than C4-5, as well as possible mild stenosis of the right neural foramen at CS-6, but no evidence of spinal cord compression. (Tr. 438.)

In an undated note, Dr. Steven Lamm stated that the plaintiff had been his patient since 1998 and opined that she was "increasingly disabled" from a variety of conditions, including "[d]egenerative arthritis involving knees and ankles" for which "surgery [was] not helpful."  (Tr. 445.)

11

At the hearing before the ALJ on March 2, 2010, the
plaintiff testified about her condition within the period from
February 1995 through December 2000.  (Tr. 35-72.)  The
plaintiff stated that during this period she had pain "every
day," mostly in her legs, and "[s]ome days were excruciating."
(Tr. 49.)  The plaintiff had pain mostly in the right knee and
right ankle between 1995 and 2000, as well as pain in the left
knee and left ankle in about 1998.  (Tr. 45.)  The plaintiff
stated that "sometimes [she] would have episodes of really
severe pain" in her right leg and eventually in her left leg as
well.  (Tr. 45.)

During the period at issue, the plaintiff described her
daily activities as "limited," and she had to hire someone to
take care of her small child.  (Tr. 46.)  The plaintiff used a
cane to walk prior to December 2000, and had difficulty using
stairs.  (Tr. 47.)  The plaintiff stated that usually she could
walk one or two blocks, but that there were periods of time when
she could not do that.  (Tr. 48.)  In addition, the plaintiff
stated that during the period at issue she was having problems
sitting.  (Tr. 50-51.)  If she were sitting in a chair, she
would have to change positions every fifteen or twenty minutes.
(Tr. 50-51.)  The plaintiff stated that sometimes she could not
sit at all and would need to lie down because sitting was "a
very uncomfortable position" for her.  (Tr. 50-51.)  She noted

12

that this scenario--in which she needed to lie down on a couch or bed--would occur as frequently as "five out of seven days." (Tr. 51.)

In his decision dated May 26, 2010, the ALJ evaluated the plaintiff's claim for DIB pursuant to the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a). (Tr. 21-28.) First, the ALJ found that the plaintiff had not engaged in substantial gainful activity from her alleged disability onset date of February 25, 1995 through her date last insured of December 31, 2000. (Tr. 23.) Second, the ALJ found that the plaintiff had the following severe impairments: "arthritis of the knees and ankles, status post right knee arthroscopy, and status post multiple fractures to the legs as a result of two motor vehicle accidents." (Tr. 23.) Third, the ALJ determined that the plaintiff's impairments or combination of impairments did not meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 24.) Fourth, the ALJ stated: "After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity ["RFC"] to perform the full range of sedentary work as defined in 20 CFR 404.1567(a)." (Tr. 24.) The ALJ determined that the plaintiff was unable to perform her past relevant work. (Tr. 26.) Fifth, the ALJ applied the medical-vocational guidelines ("the grids")

13

and determined that, given the plaintiff's age, education, work experience, and "residual functional capacity for the full range of sedentary work," the plaintiff was not disabled.  (Tr. 27, citing Medical-Vocational Rule 201.21, 20 C.F.R. Part 404, Subpart P, Appendix 2.)  The ALJ therefore concluded that the plaintiff had not been under a disability at any time from February 25, 1995 through December 31, 2000.  (Tr. 27.)

## II.

### A.

A court may set aside a determination by the Commissioner only if it is based on legal error or is not supported by substantial evidence in the record.  See 42 U.S.C. § 405(g); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).  Substantial evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)) (internal quotation marks omitted); see also Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991).

A claimant seeking DIB is considered disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or

14

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).[2]

The analytical framework for evaluating claims of disability for DIB is defined by regulations of the Commissioner, which set forth a five-step inquiry.  See 20 C.F.R. § 404.1520.  The Court of Appeals for the Second Circuit has described this five-step process as follows:

1.   The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.   If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.   If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

_____

[2] The definition of disability for the purposes of Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act is similar.  See 42 U.S.C. § 1382c(a)(3)(A).  The determination of disability under Title XVI is also similar to the determination of disability for purposes of DIB under Title II of the Act.  Ramos v. Apfel, No. 97 Civ. 6435, 1999 WL 13043, at *4 n.1 (S.D.N.Y. Jan. 12, 1999).  Cases under 42 U.S.C. § 1382c(a)(3) are cited interchangeably with cases under 42 U.S.C. § 423.  See Hankerson v. Harris, 636 F.2d 893, 895 n.2 (2d Cir. 1980).

4.   If the impairment is not "listed" in the
     regulations, the Commissioner then asks
     whether, despite the claimant's severe
     impairment, he or she has residual
     functional capacity to perform his or her
     past work.

5.   If the claimant is unable to perform his or
     her past work, the Commissioner then
     determines whether there is other work which
     the claimant could perform. The
     Commissioner bears the burden of proof on
     this last step, while the claimant has the
     burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000) (citation

omitted); see also Selian v. Astrue, 708 F.3d 409, 417-18 (2d

Cir. 2013).

The claimant bears the initial burden of proving that the

claimant is disabled within the meaning of the Social Security

Act.  See 42 U.S.C. § 423(d)(5); see also Shaw, 221 F.3d at 132.

This burden encompasses the first four steps described above.

See Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983).  If

the claimant satisfies the burden of proof through the fourth

step, the claimant has established a prima facie case and the

burden shifts to the Commissioner to prove the fifth step.  See

id. at 722-23.

In meeting the burden of proof on the fifth step for DIB

eligibility determinations, the Commissioner, under appropriate

circumstances, may rely on the medical-vocational guidelines

contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, commonly

referred to as "the grids."[3]   See 20 C.F.R. § 404.1569.  The
grids take into account the claimant's residual functional
capacity[4] in conjunction with the claimant's age, education, and
work experience.  Based on these factors, the grids indicate
whether the claimant can engage in any other substantial gainful
work that exists in the national economy.  Generally, the result
listed in the grids is dispositive on the issue of disability.
However, the grids are not dispositive where they do not
accurately represent a claimant's limitations because the
claimant suffers from non-exertional limitations that
significantly limit the claimant's capacity to work.  See Pratts
v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

When employing this five-step process, the Commissioner
must consider four factors in determining a claimant's
entitlement to benefits: "(1) the objective medical facts;
(2) diagnoses of medical opinions based on such facts;
(3) subjective evidence of pain or disability testified to by
the claimant or others; and (4) the claimant's educational

---

[3] The grids classify work into five categories based on the
exertional requirements of the different jobs.  Specifically, it
divides work into sedentary, light, medium, heavy, and very
heavy, based on the extent of requirements in the primary
strength activities of sitting, standing, walking, lifting,
carrying, pushing, and pulling.

[4] Residual functional capacity ("RFC") is an assessment of an
individual's ability, despite the impairment, to meet physical,
mental, sensory, and other demands of jobs based on all relevant
evidence.  See 20 C.F.R. § 404.1545.

background, age, and work experience." Brown v. Apfel, 174 F.3d
59, 62 (2d Cir. 1999) (internal quotation marks and citation
omitted).

In the assessment of medical evidence, a treating
physician's opinion is given controlling weight when that
opinion is "well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in [the] case record . . . ."
20 C.F.R. § 404.1527(c)(2); see also Schisler v. Sullivan,
3 F.3d 563, 567 (2d Cir. 1993).  The Commissioner's regulations
require that greater weight generally be given to the opinion of
a treating physician rather than a non-treating physician.  See
20 C.F.R. § 404.1527(c)(2).

"In order to override the opinion of the treating physician
. . . the ALJ must explicitly consider, inter alia: (1) the
frequen[cy], length, nature, and extent of treatment; (2) the
amount of medical evidence supporting the opinion; (3) the
consistency of the opinion with the remaining medical evidence;
and (4) whether the physician is a specialist." Selian, 708
F.3d at 418 (citing Burgess v. Astrue, 537 F.3d 117, 129 (2d
Cir. 2008)).

The ALJ is also required to explain the weight given to the
treating source's opinion and give good reasons for doing so.
See 20 C.F.R. § 404.1527(c)(2) ("We will always give good

18

reasons in our notice of determination or decision for the
weight we give your treating source's opinion.").

### B.

The Court reviews the ALJ's determination according to the
same five-step process used by the ALJ.  There is no dispute
that the ALJ correctly resolved the first three steps in the
process.  The plaintiff contends, however, that the ALJ
incorrectly determined the plaintiff's residual functional
capacity at the fourth step.  Specifically, the plaintiff argues
that there is no substantial evidence supporting the ALJ's
determination that "the claimant had the residual functional
capacity to perform sedentary work as defined in 20 CFR
404.1567(a)."  (Tr. 24.)

Section 404.1567(a) provides: "Sedentary work involves
lifting no more than 10 pounds at a time and occasionally
lifting or carrying articles like docket files, ledgers, and
small tools.  Although a sedentary job is defined as one which
involves sitting, a certain amount of walking and standing is
often necessary in carrying out job duties.  Jobs are sedentary
if walking and standing are required occasionally and other
sedentary criteria are met."  20 C.F.R. § 404.1567(a).
"'Occasionally' means occurring from very little up to one-third
of the time, and would generally total no more than about

2 hours of an 8-hour workday.  Sitting would generally total about 6 hours of an 8-hour workday." SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

SSR 96-8p provides, in relevant part: "The [ALJ's] RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . .  Only after that may RFC be expressed in terms of the exertional levels of work, [e.g.,] sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  However, "[t]he Second Circuit has not yet decided whether non-compliance with SSR 96-8p is per se grounds for a remand." Goodale v. Astrue, No. 11 Civ. 821, 2012 WL 6519946, at *6 (N.D.N.Y. Dec. 13, 2012).

### c.

Citing two cases from this Circuit, the plaintiff argues that the ALJ has an obligation to spell out the ALJ's assessment of residual functional capacity, specifying each of the particular functions remaining within the plaintiff's capacity and articulating the basis for each function found to exist.

In Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984), the plaintiff Ferraris appealed the district court's decision affirming the Secretary of Health and Human Services' denial of

his DIB application.  Id. at 583.  Ferraris had been injured in

a car accident and had resulting pain in his lower back and

legs.  Id.  This pain restricted him from standing, sitting, or

walking for prolonged periods of time.  Id.

The Second Circuit Court of Appeals reviewed the record in

Ferraris' case and particularly the ALJ's finding that Ferraris

had the residual functional capacity to perform sedentary work.

Id. at 585-86.  The court then held that the ALJ failed to

perform all of the duties required of him, and that in

particular his findings on Ferraris' residual functional

capacity to perform sedentary work were "wholly insufficient."

Id. at 586.  The court noted that the ALJ's findings were simply

that Ferraris could not do any prolonged standing or frequent

lifting of more than ten pounds, and from that the ALJ found in

a conclusory manner that Ferraris could do sedentary work as

defined in 20 C.F.R. § 404.1567(a).  Id.

The court then discussed the medical evidence on the issue

and pointed out that although Ferraris' ability to sit for

prolonged periods of time was critical to the ultimate

determination of his disability, the ALJ made minimal reference

to Ferraris' ability to sit.  Id. at 586-87.  Although the ALJ

vaguely referred to a "consensus" among the consulting

physicians regarding Ferraris' residual functional capacity, the

court observed that the record revealed no such consensus.  Id.

The court ultimately held that, on the basis of the ALJ's insufficient findings, it could not determine whether the ALJ's conclusory statement that Ferraris could carry out sedentary work was supported by substantial evidence.  Id. at 587. Therefore, the court instructed the ALJ on remand to "make specific findings of exactly what Ferraris can do, especially with reference to his ability to sit and for how long.  The ALJ then should determine, based on such specific findings, whether Ferraris has the residual functional capacity to perform sedentary work, bearing in mind what has developed as the concept of sedentary work."  Id. (footnote omitted).

In LaPorta v. Bowen, 737 F. Supp. 180 (N.D.N.Y. 1990), the district court similarly remanded the case to the ALJ because the ALJ's determination of LaPorta's residual functional capacity was not supported by substantial evidence.  Id. at 181. The ALJ had found LaPorta capable of performing "light work," noting in support of his finding that LaPorta had no major joint deformities, x-rays showed mild degenerative changes, and LaPorta was receiving conservative treatment with no surgery scheduled.  Id. at 183.  However, the court held that ALJ failed to show by substantial evidence that LaPorta could perform each of the requirements of "light work" as set forth in 20 C.F.R. § 404.1567(b).  Id.  Accordingly, the court instructed the ALJ on remand to "specifically state what requirements of light work

22

[LaPorta] is capable of doing and the basis for his determination." Id. at 184.

### D.

In the present case, upon reviewing the evidence before him the ALJ first described the plaintiff's leg injuries and then discussed some of the medical evidence from February 1995 through December 2000. (Tr. 25-26.) The ALJ pointed out that "[a]lthough Dr. Ranawat noted that the claimant complained of severe pain, [the claimant] required no external support in order to walk from one to three blocks." (Tr. 25.) The ALJ also noted that the plaintiff experienced improved walking after physical therapy in April 1996. (Tr. 25.) The ALJ discussed Dr. Smallberg's findings, which included a positive rheumatoid factor but largely normal results for the neurological examination. (Tr. 25.) The ALJ then discussed the findings of Dr. Spiera, who noted that the plaintiff limped and complained of foot pain. (Tr. 25-26.) The plaintiff also had decreased sensation in her feet, but no pain on straight-leg raising. (Tr. 26.) A bone scan revealed major change in both feet, but an x-ray revealed no arthritic changes or fractures. (Tr. 26.) The "confusing picture" prevented Dr. Spiera from arriving at a specific diagnosis for the plaintiff's musculoskeletal complaints. (Tr. 26.)

The ALJ ultimately found that although the plaintiff's
impairments could have caused some of the alleged symptoms,
"[her] statements concerning the intensity, persistence and
limiting effects of these symptoms are not credible to the
extent that they are inconsistent with the [ALJ's] residual
functional capacity assessment." (Tr. 26.)  The ALJ stated that
there were no specific functional limitations noted in the
medical reports, the plaintiff's doctors did not have a
consensus on the cause of her complaints, and the x-ray and MRI
studies were "either unremarkable or do not show much other than
the residuals of her knee surgery and motor vehicle accidents
from the distant past." (Tr. 26.)  The ALJ also pointed out
that Dr. Spiera only noted a slight limp, and that physical
therapy notes showed significant improvement. (Tr. 26.)  The
ALJ then concluded that "[t]he totality of the evidence
indicates that the claimant had the residual functional capacity
for at least sedentary work prior to her DLI." (Tr. 26.)

### E.

Here, as in Ferraris, the ALJ's findings with respect to
the plaintiff's capacity to perform sedentary work are wholly
insufficient.  From these insufficient findings, the Court
cannot determine whether there is substantial evidence to
support the ALJ's conclusory statement that the plaintiff can

24

perform sedentary work as defined in 20 C.F.R. § 404.1567(a).
In particular, the Court cannot determine whether there is
substantial evidence to support a finding that the plaintiff
could walk and stand for up to "about 2 hours of an 8-hour
workday" and sit for "about 6 hours of an 8-hour workday," as
required for sedentary work.  SSR 96-9p, 1996 WL 374185, at *3.

According to the plaintiff's own testimony, during the
period at issue she had daily leg pain that was "really severe"
and "excruciating" at times.  (Tr. 45, 49.)  She used a cane to
walk, and had difficulty using stairs.  (Tr. 47.)  She stated
that usually she could walk one or two blocks, but that there
were periods of time when she could not do that.  (Tr. 48.)  In
addition, the plaintiff stated that she had problems sitting,
such that if she were sitting in a chair, she would have to
change positions every fifteen or twenty minutes.  (Tr. 50-51.)
She stated that on about five out of seven days, she could not
sit at all and would need to lie down because sitting was "a
very uncomfortable position" for her.  (Tr. 50-51.)

Although the ALJ found that the plaintiff's statements
concerning the extent of her pain were "not credible" (Tr. 26),
none of the many physicians who saw the plaintiff discredited
her complaints of pain.  Moreover, the ALJ's statement that
there were no specific functional limitations noted in the
medical reports is simply untrue.  The medical record includes

25

reports noting specific functional limitations and appears to
corroborate the plaintiff's statements overall.

The record reveals that after undergoing some post-surgery
physical therapy in 1995, the plaintiff's walking tolerance was
approximately thirty minutes.  (Tr. 392.)  Dr. Springer
instructed the plaintiff to use a cane upon examining her in
April 1995 (Tr. 427), and noted in October 1995 that the
plaintiff still had a significant deficit with respect to her
quadriceps and hamstring strength (Tr. 393).

In February 1996, Dr. Ranawat noted that the plaintiff
could walk one to three blocks and had difficulty climbing
stairs, and his examination of her revealed varus alignment of
both lower extremities.  (Tr. 397.)  Dr. Ranawat also noted:
"Pain is severe and disabling to her, more on activities and
somewhat less with rest."  (Tr. 397.)  Given the severity of the
plaintiff's problems, three doctors who saw her in 1996--Dr.
Nisonson, Dr. Buechel, and Dr. Rodriguez--independently
discussed the possibility of total knee replacement surgery for
the plaintiff.  (Tr. 640, 394, 400.)

In February 1998, Dr. Springer noted that the plaintiff's
pain and swelling "restricted not only her range of motion, but
also her ability to ambulate properly," and that the plaintiff's
right-knee problems likely would require more major surgery in
the future.  (Tr. 427-28.)  Later in 1998, both Dr. Rho and Dr.

Spiera observed that the plaintiff walked with a limp.  (Tr. 479, 499.)  Dr. Smallberg noted in October 1998 that the plaintiff "has difficulty walking, and currently cannot walk more than about one to two blocks without having to stop because of severe pain in her legs."  (Tr. 191.)

Contrary to the ALJ's assertion that the x-ray and MRI studies were "unremarkable" (Tr. 26), a bone scan of the plaintiff's lower extremities taken in November 1998 revealed several physiological defects (Tr. 489-92).  In particular, the bone scan of both feet demonstrated increased activity in the left mid-foot that may have been related to osteomyelitis, and there was increased isotopic activity in both knees and ankles which was "most likely degenerative in nature."  (Tr. 489-90.)  An MRI scan of the plaintiff's left foot taken that same month also revealed several physiological defects, including synovitis of the ankle, a moderately prominent osteophyte at one joint, and degenerative changes of another joint.  (Tr. 412-13.)  An MRI scan of the plaintiff's cervical spine taken in May 2000 revealed mild disc bulging and spondylosis as well as possible mild stenosis at one location.  (Tr. 438.)

**F.**

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [the court] to

27

decide whether the determination is supported by substantial evidence." Ferraris, 728 F.2d at 587 (citing Treadwell v. Schweiker, 698 F.2d 137, 142 (2d Cir. 1983) ("the propriety of agency action must be evaluated on the basis of stated reasons")).  In light of the evidence in the record here, the ALJ's findings are insufficient to support his conclusory statement that the plaintiff could perform sedentary work as defined in 20 C.F.R. § 404.1567(a).

Without listing the demands of sedentary work or explaining how the plaintiff was capable of performing them, the ALJ summarily found the plaintiff's testimony concerning the extent of her pain "not credible," and incorrectly stated that there were no specific functional limitations noted in the medical reports.  (Tr. 26.)  The Court is left to question whether the plaintiff's ability to walk for one to three blocks would actually amount to an ability to walk and stand for up to "about 2 hours of an 8-hour workday" as required for sedentary work. SSR 96-9p, 1996 WL 374185, at *3.  It is also unclear whether the plaintiff, given her reported problems with sitting, could meet the other sedentary-work requirement of sitting for "about 6 hours of an 8-hour workday."  Id.

Because the Court cannot determine whether there is substantial evidence to support the ALJ's finding that the plaintiff could perform sedentary work, this case is remanded

for the ALJ to state specifically what requirements of sedentary
work the plaintiff was capable of performing as well as the
basis for those determinations.  The ALJ then should determine,
based on such specific findings, whether the plaintiff has the
residual functional capacity to perform sedentary work as
defined in 20 C.F.R. § 404.1567(a).


**CONCLUSION**

The Court has considered all of the arguments of the
parties.  To the extent not specifically addressed above, the
remaining arguments are either moot or without merit.  For the
foregoing reasons, the Commissioner's decision is **reversed** and
this case is **remanded** for further proceedings, pursuant to the
fourth sentence of 42 U.S.C. § 405(g).  The Clerk is directed to
enter judgment and to close this case.

**SO ORDERED.**

Dated:    New York, New York
          March 27, 2013              __/s/_____
                                         John G. Koeltl
                                  United States District Judge